# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| UNITED STATES | CRIMINAL ACTION |
|---|---|
| VERSUS | NO: 16-36 |
| LEONARD MORRISON | SECTION: "S" (1) |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress Evidence and Statements (Doc. #204) is **DENIED**.

## BACKGROUND

This matter is before the court on a motion to suppress filed by defendant, Leonard Morrison. Morrison argues that the evidence collected from his home and the statements that he made to law enforcement officers on February 25, 2016, should be suppressed because they were the fruits of an unlawful search and seizure that began as a "knock and talk."

On October 27, 2017, Morrison was charged by the Grand Jury in a Second Superseding Indictment with various conspiracy, controlled substance and firearms offenses. Count 1 charges that Morrison conspired with his co-defendants to distribute and posses with the intent to distribute cocaine hydrochloride, heroin and marijuana in violation of 21 U.S.C. § 846. The description of the overt act attributed to Morrison states:

> On or about February 25, 2016, **LEONARD MORRISON, a/k/a "Leonard London,"** did possess cocaine; heroin; marijuana; a Ruger Model Security-Six, .375 Magnum caliber revolver; and approximately $2,945.00 in United States currency.

Counts 2 and 7 charge Morrison with using a communications facility, namely a telephone, on May 1, 2015, and June 19, 2015, respectively, in committing, causing and facilitating the commission of conspiracy to distribute and possess with the intent to distribute heroin, cocaine hydrochloride and

marijuana in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2. Count 27 charges Morrison with possession with the intent to distribute cocaine hydrochloride on or about February 25, 2016, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2. Count 28 charges Morrison with possession with the intent to distribute marijuana on or about February 25, 2016, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D), and 18 U.S.C. § 2. Count 29 charges that, on or about February 25, 2016, Morrison possessed a firearm in furtherance of drug-trafficking crimes in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(A)(I), and 2. Count 30 charges that, on or about February 25, 2016, Morrison was a previously convicted felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(e)(1), and 2.

Counts 1, and 27 through 30 are premised on evidence obtained from Morrison's home and statements he made to law enforcement officers on February 25, 2016. Morrison argues such evidence should be suppressed because the search and seizure performed on that date was improper. On February 22, 2018, this court held an evidentiary hearing on Morrison's motion to suppress.

At the hearing on Morrison's motion to suppress, Trooper First Class Rohn Bordelon, a narcotics agent with the Louisiana State Police High Intensity Drug Trafficking Area division ("LSP HIDTA"), and Detective David Biondolillo, who is employed by the Jefferson Parish Sheriff's Office and assigned to the Drug Enforcement Administration High Intensity Drug Trafficking Area ("DEA HIDTA), both testified to the same facts regarding the "knock and talk." At 6:15 a.m., on February 25, 2016, agents from the LSP HIDTA and the DEA HIDTA, along with St. Charles Parish Sheriff's Office deputies (collectively "officers") approached Morrison's home located at 732 Turtle Creek Lane, St. Rose, Louisiana to conduct a "knock and talk" because Morrison's name had come up

during a narcotics investigation. Law enforcement officers obtained search warrants for three other residences associated with the investigation, while Morrison's residence was designated for a "knock and talk." The search warrants on the other residences were executed on February 25, 2016. Neither Bordelon nor Biondolillo knew why Morrison's residence was designated for a "knock and talk" instead of obtaining a search warrant.

Bordelon and Biondolillo approached the front door of Morrison's residence to conduct the "knock and talk" while 6 other officers were standing in the driveway and front yard. Biondolillo knocked on the door and announced that he and Bordelon were law enforcement officers. Neither Bordelon nor Biondolillo tried to break down the door. All of the officers at the scene carried firearms, but at no point did any officer draw his or her weapon. After about a minute, Shlonda Jupiter, Morrison's live-in-girlfriend and the mother of his children, answered the door. Jupiter opened the door a little less than half way to speak to the officers. Bordelon spoke with Jupiter while Biondolillo kept watch to ensure the officers' safety.

Bordelon testified that he identified himself to Jupiter by name and rank as a member of the LSP. Bordelon asked Jupiter if Morrison was home. Biondolillo testified that Jupiter responded that Morrison was sleeping. Bordelon testified that he saw Morrison walking behind Jupiter in the residence and Bordelon called out to Morrison. Bordelon asked Morrison if he could come in to talk to Morrison, who responded affirmatively. Bordelon testified that Jupiter stepped back and opened the door wider. Biondolillo testified that Jupiter opened the door and moved out of the way in a manner that he perceived as a gesture allowing the officers to enter the residence. Biondolillo testified that he saw Morrison coming out of the back bedroom after Jupiter opened the door. Jupiter

3

never verbally objected to the officers' entering the house. Bordelon testified that Morrison appeared as if he had been sleeping.

Both Bordelon and Biondolillo testified that they smelled burned marijuana when Jupiter opened the door. Although in his incident report, Biondolillo wrote that he smelled marijuana when he entered the house, he clarified at the hearing that he smelled the marijuana when the door opened before stepping inside the residence.

Both Bordelon and Biondolillo testified that, as Bordelon approached Morrison, Bordelon told Morrison that he smelled the strong odor of burned marijuana. Morrison stated that he had smoked marijuana the previous night. As Morrison began to lead the officers to the master bedroom, Bordelon verbally advised Morrison of his *Miranda* rights while the men were all standing in the hallway. Morrison pointed out a partially burned cigar in the master bedroom. Bordelon testified that he told Morrison that he knew the house belonged to Gregory London and that Morrison's name came up during a narcotics investigation. Bordelon noticed a child sleeping in the bed and had Morrison bring the toddler to the living room to be with his mother.

Bordelon testified that he asked Morrison to consent to a search of the residence. Morrison agreed. Bordelon read aloud, with Morrison reading silently along, the LSP and the DEA consent to search forms. Morrison did not appear to have any problem understanding the forms. Morrison initialed every paragraph of the forms, including statements that he understood his rights, that he was willing to answer questions and allow the search, and that nobody made threats or promises to induce him to answer any questions or relinquish any rights. The LSP form was signed by Morrison, Bordelon and Biondolillo. The DEA form was signed by Morrison and Biondolillo. Both Bordelon and Biondolillo testified that nobody threatened to arrest Jupiter or take away the children if

4

Morrison refused to sign. Bordelon, Biondolillo, and Shelly Paul Liner, another officer involved in the search, testified that Morrison was polite and cordial, and nobody raised his or her voice.

After Morrison signed the forms, Bordelon asked about other contraband in the residence. Biondolillo testified that Morrison, who remained in the master bedroom while the officers conducted the search, pointed out some plastic containers of marijuana. Bordelon asked Morrison if there were any weapons on the premises. Bordelon and Biondolillo both testified Morrison responded that there was a loaded firearm in the closet under some hats. Morrison claimed he found the gun in the attic when he moved in and had put it in the closet for safekeeping. The officers looked in drawers in the master bedroom and found other narcotics and narcotics paraphernalia. The officers asked for permission to search the attic, which Morrison gave. Morrison never stopped the officers from searching and was not handcuffed during the search.

Bordelon testified that Morrison was permitted to go outside to smoke when the search was completed. Bordelon accompanied Morrison outside and told him that he would be arrested, but would be allowed to hug his family goodbye and would not be handcuffed in front of the family. Bordelon and Biondolillo testified that Morrison signed receipts for the items taken from the residence and was handcuffed before being transported to the police station.

Bordelon's Case Report does not mention that he spoke with Morrison from the door or that Jupiter opened the door wider to allow the officers to enter the residence. Instead, Bordelon's Case Report states:

> Upon opening the door, agents spoke to Shlonda Jupiter. As soon as she opened the door, a strong odor of burnt marijuana began emitting from inside the residence. Members of the investigation team made contact with Leonard MORRISON . . . , who was asleep inside the residence. I . . . spoke to MORRISON and advised him of the reasons for our presence.

5

The remainder of the report recounts the rest of the events regarding Bordelon's reading Morrison the *Miranda* warning, the discussion about the burned marijuana, the signing of the consent to search forms, the discussion about the firearm, and the search of the residence. The report notes that the following items were recovered from the residence during the search: a Storm Ruger .375 Magnum Security 6 (serial #3156 44025) with five rounds of live ammunition inside the cylinder; marijuana; two pieces of brown rock-like objects suspected to be heroin; a clear plastic bag containing a white powder substances suspected to be cocaine; a prescription bottle containing four round, white tablets and a loose white powder substance suspected to be cocaine; a scale, two mixers, a Pyrex measuring cup, and a sifter, all containing suspected narcotics residue; and approximately $2,945.00 in United States currency.

Jupiter also testified at the suppression hearing. Her testimony differed from that of Bordelon and Biondolillo. Jupiter, who has known Morrison for about 20 years and has some children with him, testified that at about 6:00 a.m. on February 25, 2016, she was sleeping on the sofa when she heard banging on the front door. She got up, looked out of the window and saw a group of police officers standing outside the residence. When Jupiter answered the door, she opened it a little bit and stood between the door and the frame. Jupiter did not recall how many officers were on the porch. She testified that one of the officers asked about "Corey" owning the house and also asked for Morrison, who was in the bedroom sleeping. According to Jupiter, she was about to shut the door, when the officers pushed the door and came walking in. She testified that the officers did not ask her permission to enter and she did not open the door to let them in. Jupiter also testified that the officers did not ask Morrison for his permission to enter because he was in the bedroom asleep. Jupiter stated that, after the officers walked into the house, they remained in the living room

6

while she went to the bedroom to get Morrison. The officers did not say anything to Jupiter about smelling marijuana. Jupiter said that at some point the officers went into the bedroom with Morrison for about 30 minutes while she remained in the living room. She could not hear the conversation between the officers and Morrison. Jupiter testified that Morrison was arrested that day and that at a later date he told her that the officers threatened him to get him to sign the consent to search forms. Jupiter testified that Morrison told her that the officers said that if he did not sign the consent to search forms they would arrest Jupiter and take the children.

Morrison argues that the progression of events on the morning of February 25, 2016, went beyond the scope of a permissible "knock and talk." According to Morrison, Jupiter opened the door because the officers appeared to be executing a search warrant, and she did not think that the armed officers would leave until she responded. Morrison contends that Jupiter did not give consent for the officers to enter the house. Morrison also argues that his consent to search was not voluntarily given, because the officers coerced his consent by telling him that they would arrest Jupiter and take the children if Morrison refused to sign the forms giving the officers consent to search his home.[1]

The government argues that the "knock and talk" strategy is a reasonable investigative tool that was appropriately used in this situation. Officers sought to obtain Morrison's consent to search his residence because there was a reasonable suspicion based upon an ongoing investigation into Morrison's alleged drug trafficking activity. The government contends that Jupiter had authority to

---

[1] Morrison also argues that the officers' entry into his home was not justified by probable cause because the officers did not smell or see marijuana from the public street or when the door was closed, but rather the officers first smelled marijuana when Jupiter opened the door. Further, Morrison argues that the search was not justified by exigent circumstances because the officers created any exigent circumstances by conducting the "knock and talk" instead of seeking a warrant when they already had Morrison under surveillance. The government did not present any arguments regarding probable cause or exigent circumstances, instead contending that the officers had the occupants' consent to enter and conduct the search. Thus, the court will not discuss probable cause or exigent circumstances.

7

and did permit the officers to enter the home. Thereafter, the officers obtained Morrison's written consent to conduct the search. The government argues that Morrison's consent was freely given, and points to a statement in the forms that Morrison signed indicating that he was not "threatened, nor forced in any way" to give consent to search. Thus, the government argues that the search was conducted with Morrison's consent and the motion to suppress should be denied.

## ANALYSIS

The Fourth Amendment to the Constitution of the United States protects individuals from unreasonable searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Although the Fourth Amendment is silent on the suppression of evidence obtained in violation thereof, the jurisprudential "exclusionary" rule may be used to suppress evidence where doing so would "deter future Fourth Amendment violations." Davis v. United States, 131 S.Ct. 2419, 2426 (2011). "The exclusionary rule prohibits introduction at trial of evidence obtained as the result of an illegal search or seizure [and] excludes not only the illegally obtained evidence itself, but also other incriminating evidence derived from that primary evidence." United States v. Runyan, 275 F.3d 449, 466 (5th Cir. 2001) (citing Silverthorne Lumber Co. v. United States, 40 S.Ct. 182 (1920)). Further, "the exclusionary rule encompass[es] evidence that is the indirect product or 'fruit' of the unlawful police conduct." Id. (citing Wong Sun v. United States, 83 S.Ct. 407 (1963)).

The Supreme Court of the United States has stated that "[i]t is a 'basic principal of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" Brigham City v. Stuart, 126 S.Ct. 1943, 1947 (2006) (quoting Groh v. Ramirez, 124 S.Ct. 1284, 1290 (2004)). However, that Court has also recognized that "the warrant requirement is subject to certain reasonable exceptions," because "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Kentucky v. King, 131 S.Ct. 1849, 1856 (2011) (citing and quoting Brigham City, 126 S.Ct. at 1947). "One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." United States v. Scroggins, 599 F.3d 433, 440 (5th Cir. 2010) (quotations omitted). The government has the burden of establishing circumstances that justify a warrantless search. United States v. Wallen, 388 F.3d 161, 164 (5th Cir. 2004) (citations omitted). "In order to satisfy the consent exception, the government must demonstrate that there was (1) effective consent, (2) given voluntarily, (3) by a party with actual or apparent authority." Scroggins, 599 F.3d at 440.

The government argues that the officers gained consent to enter and search Morrison's home during the course of a "knock and talk." The United States Court of Appeals for the Fifth Circuit has recognized that the "knock and talk" strategy is "a valid investigatory technique, not requiring a warrant, when law enforcement officials seek to gain consent to search or reasonably suspect criminal activity." United States v. Albarado, 555 Fed. Appx. 353, 356 (5th Cir. 2014) (citing United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001)). "The purpose of a 'knock and talk' is not to create a show of force, nor to make demands on occupants, nor to raid a residence." United States v. Gomez-Moreno, 479 F.3d 350, 355 (5th Cir. 2007). When an officer knocks on the door, the

9

occupants have a choice of whether to open the door and speak with the officers, and whether to invite the officers into the residence. See King, 131 S.Ct. at 1862.

It is undisputed that both Jupiter and Morrison, as the adult residents of the home who were living there as a couple, both had the actual authority to consent to the officers' entering the home. It is disputed whether Jupiter or Morrison voluntarily gave consent to the officers' entering the residence.

Consent "can be implied from silence or failure to object if it follows a police officer's explicit or implicit request for consent." United States v. Martinez, 410 Fed. Appx. 759, 763 (5th Cir. 2011) (citing United States v. Jaras, 86 F.3d 383, 390 (5th Cir. 1996)). Objective reasonableness is the standard for measuring the scope of consent. United States v. Stewart, 93 F.3d 189, 192 (5th Cir. 1996) (citing United States v. Rich, 992 F.2d 502, 505 (5th Cir. 1993)). "Recitation of magic words is unnecessary; the key inquiry focuses on what the typical reasonable person would have understood by the exchange between the officer and the suspect." Id. (citing Rich, 992 F.2d at 505-06).

In United States v. Griffin, 530 F.2d 739, 741 (7th Cir. 1976), officers knocked on an apartment door and it was opened by Robert Russell, a co-defendant of the appellant, Calvin Griffin. The officers informed Russell that two men had run from the apartment, and asked Russell if he lived there. Id. Russell stated that it was his friend's apartment. Id. The officers told Russell that they had reason to believe that a burglary was in progress inside the apartment and asked permission to enter. Id. Russell stepped back into the apartment, leaving the door partially open. Id. The officers entered the apartment and followed Russell down a short hallway into the living room where they observed the evidence that Griffin sought to be suppressed. Id. Griffin argued that the officer

10

unlawfully entered the apartment because Russell did not consent to their doing so. Id. at 741-42. The district court held that "Russell consented by conduct to the officers' entry into the apartment." Id. at 742. The United States Court of Appeals for the Seventh Circuit affirmed, holding that Russell's conduct of opening the door and stepping back into the apartment, while leaving the door partially open and failing to verbally object to the officers' entrance into the apartment constituted implied consent for the officers to enter. Id. at 743.

Jupiter's actions in this case are similar to those of Russell in Griffin. Bordelon and Biondolillo both testified that Biondolillo knocked on the door and identified himself as a law enforcement officer. Bordelon, Biondolillo and Jupiter all testified that Jupiter opened the door about half way to speak with the officers. Bordelon testified that he identified himself as an officer to Jupiter, and Bordelon and Jupiter both testified that Bordelon asked for Morrison. Both Bordelon and Biondolillo testified that Jupiter opened the door wider and stepped aside after Bordelon began speaking with Morrison, whom the officers say they saw in the hallway. Jupiter testified that the officers were not speaking with Morrison before entering the residence and that she did not open the door wider and step aside, but rather that the officers barged in and then waited in the living room while she went to get Morrison, who was asleep in the bedroom.

The testimony establishes that Jupiter opened the door to speak to the officers and that she was aware that they were there to speak to Morrison. The officers testified that Jupiter initially opened the door about half way and then opened it wider and stepped aside for them to enter. Jupiter testified that she opened the door a little and stood between the door and the frame, but that she did not open it wider and step aside to allow the officers in. However, testimony of all parties indicates that there was no forced entry nor antagonistic response. Jupiter did not testify that the

11

officers physically moved her out of the way. To the contrary, Jupiter testified that the officers waited in the living room while she went to get Morrison. The officers testified that Jupiter did not verbally object to their entering the residence. Thus, under the totality of the circumstances, Jupiter gave implied consent for the officers to enter the residence.

Once it is determined that a person with authority gave consent, it must be determined whether that consent was given voluntarily. In determining whether consent was voluntary, the court considers:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his [or her] right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

United States v. Jenson, 462 F.3d 399, 406 (5th Cir. 2006). "The government bears the burden of proving that consent was voluntary." Id. "No single factor is dispositive." United States v. Rounds, 749 F.3d 326, 338 (5th Cir. 2014). Whether consent was voluntary "is a question of fact to be determined from a totality of all the circumstances." Schneckloth v. Bustamonte, 93 S.Ct. 2041, 2048 (1973).

At the time that Jupiter gave implied consent for the officers to enter the residence, she was not in custody, and she was not arrested on the day in question. The officers did not use coercive procedures on Jupiter. The officers knocked on the door while announcing that they were law enforcement. When Jupiter came to the door, they introduced themselves, stated the reason for their visit and asked to speak with Morrison. The officers did not shout at or threaten Jupiter. The fact that the officers were armed, with their weapons holstered, does not render the situation coercive. United States v. Martinez, 410 Fed. Appx. 759, 764 (5th Cir. 2011). Further, there is no indication

12

that Jupiter was unaware of her right to refuse the officers entry or that she did not have significant education and intelligence to be aware of her rights. Although Jupiter claims that she did not allow the officers into the residence, she never verbally objected to their entering and her cooperation is evidenced by her testimony that she went to get Morrison while the officers waited in the living room. Under the facts presented, the court finds that Jupiter's implied consent was voluntarily given.

As to Morrison's signing the forms giving the officers consent to search the residence, it is undisputed that Morrison had the actual authority to give consent and that he signed the forms. Morrison contends that he did not consent voluntarily. Applying the factors outlined above, the court finds that the weight of the Jenson factors demonstrates that Morrison's consent was voluntarily given.

Morrison was not in custody at the time that he signed the consent to search forms. Instead, he was in his bedroom and was allowed to leave the bedroom to bring his son to the living room and to go outside to smoke. Bordelon and Biondolillo testified that Morrison was very cooperative, polite and cordial. Jupiter denied hearing any raised voices during the process. Jupiter's testimony established that Morrison had a prior criminal conviction. Thus, he had experience and knowledge to understand what was occurring and that he could refuse consent. Further, Morrison initialed the paragraphs of the LSP consent to search form that states that he had the right to stop answering questions at any time and that he understood his rights. It is obvious that Morrison knew some incriminating evidence would be found because the officers spoke with him about the marijuana that they smelled prior to asking for his consent to search.

Finally, the evidence demonstrates that there were no coercive police procedures. Both Bordelon and Biondolillo testified that they did not threaten Morrison in any way, and Morrison initialed the LSP and DEA consent to search forms where they stated that he was not threatened or forced in any way to give up his rights. Jupiter did not hear the officers threaten Morrison. Jupiter's testimony in this regard is based on a later conversation that she claims she had with Morrison. Morrison may have told Jupiter that the officers threatened him, but the weight of the credible evidence demonstrates that the officers did not coerce Morrison to sign the forms. Bordelon and Biondolillo both have first hand knowledge of what occurred when Morrison signed the forms, whereas Jupiter does not. Further, Bordelon, Biondolillo and Liner all testified that Morrison was polite and cordial during the search. It is unlikely that Morrison would have acted in such a way if the officers had just threatened to arrest Jupiter and take away his children.

Considering the Jensen factors used to determine whether the consent was voluntary, only one, the defendant's belief that no incriminating evidence would be found, weighs against finding that Morrison's consent was voluntarily given. Thus, the Jenson factors viewed together weigh in favor of finding that Morrison's consent to search was voluntarily given.

## CONCLUSION

Because Jupiter gave the officers her implied consent to enter the residence and Morrison voluntarily gave them consent to search, the government has carried its burden of establishing an exception to the prohibition against a warrantless search.

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress Evidence and Statements (Doc. #204) is **DENIED**.

New Orleans, Louisiana, this \_\_\_21st\_\_\_day of March, 2018.

_____
**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**